## HEDLUN V. HOLY TERROR MIN. CO.

1. Where a complaint in an action for injuries pleaded that a release which plaintiff had given was induced by fraud, and prayed to have the same vacated, such allegations might properly be regarded as surplusage, the release being matter of defense.

2. Where a complaint in an action for injuries prayed to have a release set aside for fraud, the complaint was not objectionable for failure to allege a tender of the amount received as a consideration for the release, no tender of such amount being required to be made before suit brought, the amount being a proper deduction from plaintiff's recovery, if any.

3. Where, in an action for injuries to a miner by an explosion, it was claimed that the injury resulted from defendant's negligence in furnishing

a quicker fuse than had been previously furnished without notifying plaintiff thereof, a question as to how far away plaintiff had got on the other shifts before the shots went off was proper as tending to show that the fuse used at the time of the accident was quicker than those used on the preceding shifts.

4. Error in the admission of evidence without a proper foundation being laid therefor is harmless where such foundation is laid during the subsequent progress of the trial.

5. Where it was claimed that injuries to an experienced miner were caused by defendant's negligence in furnishing a quicker fuse with which to set off a blast than had been previously furnished without informing plaintiff thereof, and it was shown that there was a substantial difference in so-called standard fuses as to the rapidity with which they burn, which difference was not discernible to even experienced miners, evidence that in plaintiff's opinion the fuse used on the morning of the accident was not of the same quality or character as the fuse previously used by him was not objectionable on the ground that there was no claim that the fuse was defective, or insufficient, or not of standard make.

6. In an action for injuries to a miner by an explosion in a shaft, a question to an expert miner whether it would have been possible to have so arranged the guides in the shaft as to lower the cage to the bottom of the shaft on which plaintiff was working was not objectionable as calling for the conclusion of the witness, the fact being provable only by expert opinions.

7. Defendant was not entitled to object for the first time on appeal that such inquiry should have been whether such an arrangement was "practicable," not "possible."

8. Where, in an action for injuries, it was claimed that a release had been procured by fraud and undue influence, and the witness procuring the release testified in chief directly contradictory to plaintiff's testimony relative to the execution of the release, and to a fatal admission made by plaintiff three days after the accident, plaintiff was entitled to show on cross-examination that such witness was the adjuster for an insurance company ultimately liable for the injury, and other facts tending to show his interest in the result of the litigation.

9. In the absence of a request to have the jury excluded during an argu-

ment of counsel as to the admission of evidence objected to, a statement by counsel to the court as to what he expected to prove by such evidence in the presence of the jury was not error.

10. Where, in an action for injuries, it was contended that a release relied on as a defense had been obtained by fraud, an erroneous statement of the court as to the release, made in overruling an objection to evidence which was properly admitted, was not reversible error, the issue relative to the release to which the evidence related being correctly defined in the charge.

11. Where, in an action for injuries, it was contended that a release relied on by defendants as a defense had been procured by the agent of an indemnity company ultimately liable by fraud and undue influence, statements by plaintiff's counsel in argument to the jury that the agent went to plaintiff's home "to rob a cripple of his rights," and that the conduct of defendant's counsel in the case showed "the cloven hoof of the monster," and that the name of the indemnity company was "like a crimson rag thrown in the face of the counsel for the defendant," was not prejudicial error.

12. Where the issues are fully stated to the jury in some part of the charge in such a manner as to be understood, it is immaterial that the opening portion of the court's charge did not exhaustively define the issues.

13. An assignment that "the court erred in giving plaintiff's instruction No. 5 (Abs., folios 450-452)," without stating wherein the instruction was erroneous, was not sufficient to authorize a review thereof.

14. Plaintiff was injured by an explosion in a mine which occurred before plaintiff and his fellow workmen had been hoisted a sufficient distance up the shaft after splitting the fuse to avoid danger, and plaintiff claimed that the fuse furnished by defendant that day was quicker than fuses previously furnished, and that defendant had not informed plaintiff that a change in the fuses generally used had been made. As to whether the fuse was quicker, and known to be so by defendant's agent and whether the difference was discernible in the mine, and whether plaintiff or any of his companions knew or could have thereof, the evidence was conflicting. Held, that a verdict for plaintiff was not unsupported by the evidence.

CORSON, J., dissenting.

(Opinion filed Oct. 7, 1902.)

Appeal from circuit court, Pennington county. Hon. LEVI McGEE, Judge.

Action by John Hedlun against the Holy Terror Mining Company. From a judgment in favor of plaintiff, defendant appeals. Affirmed.

*Wood & Buell* and *Fowler & Whitfield*, for appellant.

If the plaintiff desired to repudiate the settlement, he should have tendered back to the defendant, the consideration he received prior to the commencement of his action. It is not sufficient to offer to restore in his complaint.

Breyfogle v. Walsh 80, Fed. 172; Hammond v. Wallace 85 Cal. 531; Dotterer v. Freeman 88, Georgia 479.

When the defendant supplied plaintiff with a standard fuse, reasonably suitable and reasonably safe, by proper use, for the work the plaintiff was then engaged in it discharged its entire duty in this respect.

Bailey's Master's Liability for Injuries to Servants. Page 2, and cases cited. Naylor v. Railway Co., 53 Wis. 661; Lake Shore Railway Co. v. McCormick, 74 Ind. 440; Wormell v. Railway Co., 79 Me. 404; Brabbitts v. Railway Co., 38 Wis. 289; Hough v. Railway Co., 110 U. S. 213.

The plaintiff was a practical and experienced miner. It was one of the requirements of his duties, that he should know how to use the fuse and powder in his work of blasting rock. Burns v. Senett, 33 Pac. 916; Turbley v. Whitin Machine Works, 51 N. E. 463; Prybiliski v. Northwestern Coal Co., 74 N. W. 117.

Servants who are entrusted with a duty of making or constructing an appliance of this kind must make or construct it safely and required to do the work in such a way as to avoid

injury, and if through their failure or neglect in this respect they suffer injury, they cannot recover. Russell Creek Coal Co. v. Wells, 31 S. E. 614; Conway v. Chicago G. W. Railway Co., 72 N. W. 543; Butte v. Coal Co., 47 Pac. 77; Stroble v. Railway Co., 70 Ia. 555; Chicago & A. R'y. Co. v. Brogonier, 7 N. E. Rep. 688; Wanamaker v. Burke, 2 Atlantic Rep. 500.

It furthermore appears that the plaintiff discovered the condition of the approach to the cage just before the blasting and consequently was fully aware of the dangers, if any, growing out of such defect, if any. The plaintiff possessing knowledge of such defect, if any, or if he could have ascertained it by reasonable care, he assumed the risk of working there, and cannot recover. Carlson v. Water Co., 5 S. D. 402; Schmidt v. Leistekow, 6 D. 386; Bennett v. N. P. Railway Co., 2 N. D. 112; Carlson v. Walter Co., 8 S. D. 47; Walsh v. Railway Co., 27 Minn. 367; Illick v. Railway Co., 67 Mich. 639; Murton v. Railway Co., 81 Mich. 435; Lake Shore Railway Co. v. O'Connor, 115 Ill. 254; Hathaway v. Railway Co., 51 Mich. 259; Wormell v. Railway Co., 79 Me. 405.

It has become a recognized fact, that running or constructing a drift or cross cut of this kind in rock by means of drilling with powder and fuse, is a hazardous business, and servants are required to use extra precautions for their own safety, and if they fail to do so or suffer injury, or if such injury is sustained in the ordinary risks of business in which the servant is employed, the master is not responsible. McKeever v. Homestake Mining Co. 10 S. D. 599; Carlson v. Sioux Falls, 5 S. D. 402; Anderson v. Daly Mining Co., 50 Pac. 815; Chielinsky v. Hooper & Townsend Co., 40 Atl. Rep. 1127.

A master is not liable for an injury sustained through the

neglect of a fellow servant that it is only necessary to cite a few of the leading cases to this proposition. Ell. v. N. P. Ry Co., 1 N. D. 336; Gates v. Ry. Co., 4 S. D. 435; Elliott v. Ry. Co., 5 D. 523; Gates v. Ry. Co., 2 S. D. 422; Daves v. Ry. Co., 88 Cal. 360; Ry Co. v. Baugh 13 Sup. Ct. Rep. 914; Kielley v. Belcher, Mining Co., 10 Morrison Mining Rep. 11; N. P. Ry. Co. v. Hogan 63 Fed. 102; Fosburg v. Phillips Fuel Co., 61 N. W. 400 (Ia).

It is error for the trial court to instruct the jury upon questions not supported by the evidence and upon issues not tendered by the pleadings. Bertelson v. Chicago M. & St. P. Ry. Co., 5 D. 315; Sargent v. Linden Mining Co., 55 Cal. 204; Gibbs v. Wall, 10 Colo. 153; Cressey v. Postville 59 Ia. 62; Western Ins. Co. v. Thorp, 40 Kan. 255; Wilcox v. Chicago Etc. Ry. Co., 24 Minn. 269.

*William Gardner, A. K. Gardner, D. M. Kelleher,* and *I. W. Goodner,* for respondent.

Each specification of error should in and of itself present the question the court is called upon to decide. It must state some reason why the ruling was erroneous, and the court should not be compelled to go beyond the assignment itself to learn what the question is. The assignment must be so specific that the court will not need to search further into the record. Franz Falk Brewing Co. v. Mielenz, 5 Dak. Ter., 136; Landis v. Evans, 133 Pa. St., 332; Erwin v. Kutruff, 152 Pa. St., 609; Ency. Pl. Pr., (Vol. 2,) pages 940, 941 and 943, and cases cited in notes on said pages.

The rule is, that where a party executes a release, as is alleged in the case at bar, it is not necessary to pay or offer to pay back the money received, and the court should instruct

the jury that if they find for the plaintiff and find that he has received anything on account of the injuries complained of, this amount should be deducted by the jury.   Railroad Co. v. Doyle, 18 Kas., 58; O'Brien v. Chicago, etc. R. Co., 57 N. W., 425; Sanford v. Royal Insurance Co., 40 Pac., 609; Girard v. St. Louis Car etc. Co., 45 Am. St. R., 556; Bliss v. N. Y. Cen. & H. R. Co., 160 Mass., 447.

And the same rule obtains where the release is signed or procured through a mistake or misunderstanding.   McGlenn v. Railroad Co., 93 N. Y., 655; Kirschner v. New Haven Sewing Machine Co., 34 N. E., 1104; Mateer v Mo. Pac. R Co., 13 S. W. 970; Jones v. Ala. etc, R. Co., 16 So., 379; Schultz v. Railroad Co., 44 Wis., 645; Christianson v. Railroad Co., 69 N. W., 640; Byers v. Nashville etc, R. Co., 29 S. W., 128; Sobreski v. St. Paul R. Co., 42 N. W., 863; Connor v. Dundee Chemical Works, 17 Atl., 975.

It is the duty of the master to furnish his servants with a reasonably safe place in which to work, reasonably safe and proper material and appliances and to keep them in proper repair and reasonably safe.   These among others, are personal in their nature, and the master cannot escape liability by an attempted delegation thereof to some one else.   Louisville etc, R. Co. v. Wright, 115 Ind., 378; Johnson v. First National Bank, 79 Wis., 414; Pullman Palace Car Co. v. Laack, 133 Ill., 248; Consolidated Ice Co. v. Keifer, 10 L. R. A., 696; Anderson v. Bennett, (Ore,) 8 Am. St. R., 311; Galveston etc, R. Co. v. Smith, 18 Am. St. R., 78; Northern Pac. R. Co. v. Herbert (Dak. Ter.,) 13 N. W., 349; Cavanaugh v. O'Neill, 5 N. Y. Sup., 207; Kranz v. L. I. R., Co., 20 Am., St. R., 716; Elledge v. National City etc, R. Co., 38 Am. St. R., 290; South West

Implement Co. v. Smith, 17 Am. St. R., 59; Stahl v. City of Duluth, 74 N. W.; 743; Bellville Stone Co. v. Mooney, 38 Atl., 835.

It appears by the undisputed evidence that the defendant had been apprised by the plaintiff of the dangerous condition of the cage and that the superintendent of the company promised the plaintiff that he would have it remedied. The defendant then had notice of the condition of the cage and had promised the plaintiff to remedy it. The plaintiff did not then, by continuing in the company's employment, assume the risks arising from the dangerous condition of the cage. Homestake Mining Co. v. Fullerton, 69 Fed., 923; Huff v. Railroad Company, 100 U. S., 213; Gulf etc, R. Co. v. Donnelly, 70 Tex. 371; Conroy v. Iron Works, 62 Mo., 35; Patterson v. Pittsburg R. Co., 76 Pa. St., 389; Muadleston v. Machine Shop Co., 106 Mass., 282; Green v. Minneapolis etc, R. Co., 31 Minn., 248; Manufacturing Co. v, Morrissey, 40 Ohio St., 148; LeClair v. First Div. St. P., etc., R. Co., 20 Minn-, 9.

The master cannot divest himself of the duty of providing a safe place for the servant to work, and he is responsible as for his own personal negligence for want of proper caution on the part of his subordinates or agents. Mobile Ry. Co. v. Godfry, 155 Ill., 78; Chicago R. Co. v. Jackson, 55 Ill., 492; St. L. A. & T. Co. v. Eggman, 161 Ill., 155; Atchison Ry. Co. v. Moore, 29 Kans., 632; Hannibal R. Co. v. Fox, 31 Kans., 587; Lake Shore R. Co. v. Lavalley, 36 Ohio St., 221; Moore v. Wabash R. Co.; 85 Mo., 588; Coombs v. N. B. Cordage Co., 102 Mass., 572; Benzin v. Stainway., 101 N. Y., 547.

Whether or not plaintiff was in the exercise of ordinary care, was a question of fact for a jury. Cameron v. G. N. R.

Co., 77 N. W., 1016; Hennassey v. City of Boston, 16 Mass., 502; Atchison R. Co. v. Moore, 29 Kans., 632; Arkarson v. Dennison, 117 Mass., 407; Moore v. Wabash Ry. Co., 85 Mo., 588; Lake Shore Ry. Co. v. Lavalley, 36 O. St., 221.

The fellow-servant rule does not apply to those duties which the master owes to the servant, and if the fellow servant is negligent in the performance of such duties, it is the negligence of the master. Hankins v. N. Y. L. E. & W. R. C , 142 N. Y., 416. (25 L. R. A., 396.); Ell. v. Northern Pac. R. C., 1 N. D., 336; Buswell on Personal Injuries, § 201.

It is as well established as the fellow-servant rule itself, that if the negligence of the master be one of the contributing causes of the servant's injury, then the servant is entitled to recover, even though the negligence of his fellow-servant may have contributed to the injury. Sherman v. Menomonee River Lumber Co., 72 Wis., 122; (1 L. R. A. 173.); Railroad Co. v. Spence, (Tenn.), 42 Am. St. R., 907; Hunn v. Mich. Cen. R. Co., 78 Mich., 515; (7 L. R. A., 500.); Griffin v. Boston etc, R. Co., 148 Mass., 143; Houston & T. C. R. Co., v. Lowe, 11 S. W., 1065; Ford v. Fitchburg R. Co., 110 Mass., 240; Bluedorm v. Mo. Pac. R. Co., 108 Mo., 439; (32 Am. St. R., 645.)

HANEY, P. J. This is an action to recover damages for personal injuries received by the plaintiff while employed by the defendant, a domestic corporation, blasting rock in its mine. Its trial resulted in a judgment for $12,000, from which, and an order denying its application for a new trial, the defendant appealed.

It is alleged in the complaint that the defendant was negligent (1) in failing to provide proper means of ingress to the

cage in which the plaintiff and his colaborers were conveyed to and from their work, and (2) in furnishing a quicker fuse on the day of the accident than that previously furnished, knowing that it was quicker, without informing the plaintiff of the change, he being without knowledge or notice of the change, and unable by the exercise of reasonable diligence and observation, to learn of it. It is also alleged on information and belief that after his injuries, resulting in the loss of his left leg seven inches below the knee, were received, "while the plaintiff was confined to his bed by reason of the injuries hereinbefore complained of, and while he was in great distress in body and mind, and while he was under the influence of cocaine, morphine, and other medicines calculated to affect his mind in such a manner that he did not understand or know what he was doing, and was in fact non compos mentis, the defendant by its agent, came to the house of the plaintiff at Keystone, South Dakota, and there and then taking advantage of this plaintiff's condition, well knowing that this plaintiff was not in a condition of mind to attend to any business, or to know the results of his own acts, or to understand what his own condition was, falsely, fraudulently, and knowingly persuaded this plaintiff to enter into an agreement of settlement, the consideration of which purported to be two hundred and seventy-three and sixty-five one-hundredths ($273.65) dollars, a sum wholly inadequate to even pay the expenses to which this plaintiff has been put by reason of the said accident, and in no manner compensating this plaintiff for the injuries sustained by him; that this plaintiff hereby tenders back to the said defendant whatever sum or sums it may have advanced by reason of the said pretended agreement, and hereby repudiates

and disaffirms said pretended settlement with the said defendant." Defendant's demurrer to the complaint on the ground that it does not state facts sufficient to constitute a cause of action having been overruled, it answered, denying each and every allegation of the complaint not specifically admitted; admitting its corporate existence, ownership of the mine, the employment of the plaintiff as a miner and servant at the time of the injury mentioned in the complaint, and that thereafter plaintiff entered into an agreement of settlement with the defendant in consideration of $273.65, paid to him by the defendant, whereby the plaintiff, in writing, wholly satisfied, discharged, and released the defendant from all damage or liability on account of the injuries complained of in the complaint; and alleging "that at the time of entering into said compromise contract and the execution and delivery of said written release and satisfaction thereof the plaintiff was of sound contracting mind, and the same was entered into without any fraud on the part of the defendant, or any undue influence exerted by the defendant or its agents, and the same was the free and voluntary act of the plaintiff; and that since the date of the entering into of said compromise agreement the plaintiff never rescinded or offered to rescind said contract, prior to the commencement of this action, and never returned or offered to return the consideration paid to him therefor, or any part thereof; and that as to the alleged tender of the consideration received under said contract into court, as alleged in the complaint, the defendant alleges that there has been no money paid into court, either to the judge or clerk thereof, or to any other person; and that the said compromise agreement is in full force and effect, and is an absolute bar to the action of

plaintiff." It is also alleged in the answer "that the defendant corporation is not in any manner liable for any injuries which were received by the plaintiff at the time and place mentioned in plaintiff's complaint; and that his said alleged injuries were not caused by reason of any negligence, carelessness, or fault on the part of this defendant or its agents, servants, or employes, but that said injuries were caused solely and entirely by reason of the fault, negligence, and carelessness of the said plaintiff himself."

It is contended that the demurrer to the complaint and defendant's objection to the introduction of any evidence should have been sustained, for the reason that the complaint contains no allegation of a tender of the amount received from defendant in consideration of the alleged settlement. The release was a matter of defense which should not have been mentioned in the complaint, and the allegations relating thereto might properly be regarded as surplusage. Trotter v. Life Association, 9 S. D. 596, 70 N. W. 843, 62 Am. St. Rep. 887. Nor was the complaint defective if such allegations be regarded as a part of it. In reviewing the ruling of the lower court upon the demurrer and upon defendant's objection to the introduction of any evidence, all of the well-pleaded facts contained in the complaint are admitted to be true. If so, the alleged release or settlement was fraudulently obtained, and in such case the better and more reasonable rule is that a tender of the amount received by the plaintiff need not be made before action is commenced, the release being treated as a receipt for a partial payment, to be deducted from the amount of the plaintiff's recovery. O'Brien v. Railway Co. (Iowa) 57 N. W. 425; Railroad Co. v. Doyle, 18 Kan. 58; Sanford v. Insurance Co. (Wash.) 40

Pac. 606; Bliss v. Railway Co., 160 Mass. 447, 36 N. E. 65, 39 Am. St. Rep. 504. At the time of receiving his injuries the plaintiff, an experienced miner, was working with Joseph Everly, James Hopkins, and Sherman Dunning in a crosscut at a point about 500 feet below the surface of defendant's mine. They were engaged in drilling and blasting rock. The plaintiff and Everly were partners, as were Hopkins and Dunning. During the night they drilled holes in the face of the crosscut with air drills. When of sufficient depth, each hole was loaded with giant powder, to which was attached a fuse. The men were conveyed to and from their work in a cage operated up and down the shaft by means of a steam hoist. During the night preceding the accident the plaintiff and his partner drilled six holes. Hopkins and Dunning drilled six, and there was one which had been previously drilled. In the morning the tools were taken out, the holes were loaded, the blasting signal was given, and a lagging was so placed as to enable the men to more readily get into or onto the cage. The men then proceded to spit the holes, which consisted in splitting the fuse with a knife, and then lighting it with a candle. The plaintiff and Everly spit seven holes and got onto the cage. Everly was on the cage first. The plaintiff got on next, and called to Hopkins and Dunning to come. Hopkins had trouble with his last hole, trying the second—perhaps the third—time to spit it, without success, when Dunning and he left it, to get on the cage. Dunning reached there first, followed by Hopkins, who, getting on the cage, gave the signal to raise it; which was instantly done by the engineer in charge, but before it had been raised above the roof of the crosscut two holes exploded throwing large quantities of rock onto the cage, and causing the injuries to plaintiff complained of in this action.

16 S. D.—18

It is contended that the court erred in permitting the plaintiff, when on the stand as a witness on his own behalf, to answer the following question: "On the other shifts, how far away had you gotten up the shaft before the shots went off?" The answer was: "We always got up to the '400,' and stood there until our shots went off. Sometimes we used to be up there a minute or two before the shots went off. The evident purpose of this question was to show that the fuse used at the time of the accident was quicker than that used during the preceding shifts. It was proper for that purpose. Of course, its weight depended upon the conditions existing during the preceding shifts and when the accident occurred, but that was a matter for the jury. The question was preceded by evidence as to the condition of the mine and the nature of the work in which the plaintiff was engaged. Later in the trial all the conditions and circumstances surrounding the work on the crosscut from its inception to the time of the accident were fully described. Hence there was no reversible error in the ruling, even if a proper foundation for it had not been laid when it was first received. We think, however, that the foundation was sufficient. The same witness was asked this question: "Now, Mr. Hedlun, based upon your experience as a miner, and in the use of fuse and blasting powder, I will ask whether or not, in your opinion, the fuse used by you in the morning of the accident was the same quality or character of fuse used on the previous morning and the morning before?" His answer was, "No." It is contended that this evidence was inadmissible, for the reason there was no claim that the fuse was defective or insufficient, or that it was not a standard fuse. The contention is untenable, If, as a matter of fact, there is a sub-

stantial difference in so-called standard fuses as to the rapidity with which they burn, and such difference is not discernible to even experienced miners, it was certainly defendant's duty when knowingly changing from a slower to a quicker fuse, to inform its employes of such change. This subject will receive further consideration in discussing the sufficiency of the evidence. Mr. Hopkins, testifying as a witness for the plaintiff, was asked: "Would it have been possible to have so arranged the guides in this shaft as to lower the cage to the bottom of the shaft on which you were working?" Defendant objected on the ground that the question "called for a conclusion of the witness." The witness was an expert miner. The fact sought to be established could have been proved only by expert opinions. The suggestion that the inquiry should have been whether such an arrangement was "practicable," not "possible," comes too late. It should have been made at the trial, when the phraseology of the interrogatory could have been modified if not technically accurate, J. F. Edmonds, called as a witness on behalf of the defendant, testified on the direct examination as follows: "I reside in Denver, Colorado. In 1897 I resided at Deadwood. It came to my knowledge that an accident had occurred at the Holy Terror mine about the 12th of April, 1897; and soon after the accident I was at Keystone, on the 15th of April. I met the plaintiff, John Hedlun, at that time, I went to his house at Keystone, and had a talk with him in regard to this accident. I don't think any one was present the first time 1 went to see him, unless the nurse was there. In that conversation I asked Mr. Hedlun how the accident happened, and he told me that he and Mr. Everly were on the cage, after having spitted the fuse in their holes that they had drilled, and were

waiting for Mr. Hopkins and Dunning; and they had some difficulty getting them to come, and he had called to them to hurry up: and he said, 'I became very anxious, and had a notion to run the cage up, and leave them there;' and I asked him if he had any blame to lay on any one, and he said, 'No, only the boys;' and I asked him if he blamed the company, and he said, 'No.' He said he could have run the cage up and escaped, and he said he wished he had. I again visited Keystone in about three weeks, during the month of May—4th or 5th of May. I again met Mr. Hedlun. The way I come to go to Mr. Hedlun's house was through Mr. George. Mr. George requested me to see Mr. Hedlun, and see if he would be willing to sign a release, providing we did something for him in the way of paying the expenses of cutting off his leg and his nurse and drug bill. This was prior to that time I had a talk with Mr. George, but I went over at his request; and I asked Mr. Fayel to go and see Mr. Hedlun, and see if he was disposed to make a settlement at that time. I went to Mr. Hedlun's house with Mr. Fayel, and told Mr. Hedlun, in the presence of Mr. Fayel and his wife, Mrs. Hedlun, that we would be willing, in consideration of his signing a receipt in full release of any claim upon the Holy Terror Company, to pay the expenses of Dr. Howe to Keystone for cutting off his leg, and to pay Mr. Twiggs, the nurse, the nurse bill (something like $90), and the purchase of a new limb, and his drug bill—making in all about $300; and I asked him if he was willing to do that; and he said he would; and Mr. Fayel and I retired from the room, and left him and his wife together, to let them have any talk they might see fit; and we then came back to the presence of Hedlun and his wife, and they signed the receipt, and we acknowl-

edged it.  I opened up the conversation by saying to Mr. Hedlun that Mr. Fayel said he was willing to settle on this basis, and Hedlun said he was, and, I think, drew the release; and he signed it in·duplicate, both of them in the presence of his wife and John Fayel, and the three of us signed as witnesses.  I told him that I understood from Mr. Fayel that he would settle on this basis,  He said he was willing to do this.  And we told him we wanted him to sign a release to that effect, and he said he would.  We then drew the release, and I took a fountain pen from my pocket, and in the meantime we had hunted around for some ink, and couldn't find it; and I took a book and put on the bed in front of him, and·he signed it; and when we got through he thanked us for it.  (The witness is handed defendant's Exhibit A, dated May 4, 1897, purporting to be a release for the consideration of $273.65, which is identified by the witness as the one referred to as having been made out and signed by Mr. Hedlun.and the witness and John J. Fayel and Mrs. Hedlun as witnesses.)  Mrs. Hedlun and John J. Fayel each signed there in my presence."  On cross-examination, after numerous inquiries, to which defendant objected, as not proper cross examination, the witness evasively and reluctantly admitted that when he visited the plaintiff he was in fact representing the Employers' Liability Assurance Company of London, which had issued a policy indemnifying the defendant against legal liabilities upon certain terms and conditions not stated.  His testimoney in chief was directly contradictory of the plaintiff's testimony relative to the execution of the release. It also tended to prove a fatal admission made by the plaintiff three days after the accident occurred, and it was apparently intended to mislead the jury as to the witness' real relations to

and interest in the litigation. In view of its importance, and the manner in which the testimony of this witness was given, we are satisfied his cross-examination did not exceed the latitude allowed to the discretion of a trial judge under such circumstances. What effect should be given the writing purporting to be a release depended largely upon the credibility of this witness. In reaching a just conclusion on that question, it was proper and necessary that the jury should know to what extent the witness was interested in the result of the litigation. That he was deeply interested, and decidedly hostile to the plaintiff, was clearly demonstrated by the cross-examination.

During Edmonds' cross-examination one of plaintiff's attorneys made the following statement, presumably addressed to the court: "We desire to show by this witness who the real defendant and party in interest is. We are entitled to show that the Holy Terror Mining Company is not the real party in interest, but that it is fully indemnified by this London Insurance Company, and would not be obliged to pay anything to the plaintiff; but it is this insurance company upon whom the verdict must ultimately fall; and to show what interest the witness has in the case. We are entitled to show this for the purpose of showing the interest of this witness in the result of this controversy, and thus affect his credibility. The jury are clearly entitled to know what interest, if any, this witness or his principal has in the result of this controversy." This language appears to have been employed in the course of a proper and usual argument relative to the cross-examination then in progress, to which opposing counsel were interposing numerous objections; and, in the absence of any request to have the jury excluded during such discussion, de-

fendant has no just cause of complaint,  Moreover, counsel in effect merely contended that he was entitled to show the witness' interest in the action, and this, as has been stated, he was entitled to do.

It is contended that the court erred in making the following statement, presumably to counsel in the presence of the jury, near the close of Edmond's cross-examination:  "The court makes this statement:  That this evidence is admitted for the reason that, if this insurance company settled with John Hedlun, it does not matter in what way the receipt is written.  The settlement is with the insurance company, and not with the Holy Terror Mining Company."  It will be readily conceded that this remark was unnecessary and inappropriate, and it may not be improper to observe that trial judges should usually rule on objections to the introduction of evidence without any comments whatever, but we cannot regard the conduct of the circuit judge in this instance as involving reversible error. He may have given an erroneous reason for admitting the evidence, but it was properly admitted, and the issue relative to the release was correctly defined in the court's charge to the jury.  It can hardly be contended that an ordinarily intelligent juror would be guided by such a remark, made during the progress of an extended and closely contested trial, rather than by the instructions given with the submission of the case; and, if we cannot assume that jurors possess ordinary intelligence, the jury system might better be abolished.

It is contended that a new trial should be ordered because of certain remarks made by D. M, Kelleher, one of plaintiff's attorneys, in his opening address to the jury.  He stated, in effect, that the witness Edmonds was the agent of the insur-

ance company heretofore mentioned; that as such agent he went to the plaintiff's home to ''rob a cripple of his rights;'' that during his experience he had never witnessed before what counsel had done in the case; that it showed ''the cloven hoof of the monster'' which was the real defendant; that it showed upon what the defense was based, and what company would be protected if counsel succeeded in obscuring the record and secured a verdict; and that the name of the insurance company was ''like a crimson rag thrown in the face of the counsel of the defendant.'' As we read the record, all of the address of counsel to which exception is taken refers to the issue of actual fraud in connection with the execution of the alleged release. If that instrument was fraudulently procured, and under the instructions of the court the jury necessarily found that it was, the conduct of Edmonds, who was principally responsible for the fraud, deserved severe condemnation. It is difficult to announce any general rule sufficiently comprehensive to embrace all the circumstances which may arise in the trial of civil causes for the government of counsel in addressing juries. Each case must depend largely upon its own peculiar facts. It may be that counsel, in his zeal for his client, in this case exceeded the bounds of good taste; but we cannot conclude, in view of the entire record, that he so far exceeded the limits of legitimate argument as to justify a reversal of the judgment.

Several objections are urged to the statement of the issues in the opening portion of the court's charge. It is true that the issues raised by the pleadings are not exhaustively defined therein. But it is not necessary that all the issues should be stated in a single paragraph of the charge. It is sufficient if they are fully stated to the jury in some part of the charge in

such a manner as to be understood.    11 Enc. Pl. & Prac. 157.
Taking the charge as a whole, we do not believe the jurors
could have been misled as to the issues they were called upon
to determine by reason of the incompleteness of the opening
statement.

Appellant's seventy-third assignment of error reads as
follows:    "The court erred in giving plaintiff's instruction No.
5, (Abs., folios 450-452.)"    Without conceding the instruction
to be erroneous, respondent insists that it cannot be reviewed,
because the assignment of error is too indefinite.    We think re-
spondent's position is well taken.    "It is not only necessary to
allege or assert error on the part of the court in doing the act
complained of, but there must be some ground alleged as the
basis of the assignment that the act was erroneous, and it must
be specifically and definitely declared or set forth in the assign-
ment, and as part of it, how, why, in what way, on what
ground, or for what reason, an error was committed 'or exists,
or is claimed to exist.    The very meaning of the word 'assign'
is 'to mark out,' 'to allot,' 'to apportion,' 'to make over'; and
there can be no assignment unless it discloses and designates
what is marked out, or allotted, or apportioned, or made over.
An assignment of error actually means the marking or point-
ing out of the error."    Franz Falk Brewing Co. v. Mielenz Bros.,
5 Dak. 138, 37 N. W. 728; State v, Chapman, 1 S. D. 414, 47 N.
W. 411, 10 L. R. A. 432.    The rule requiring errors to be spe-
cifically pointed out is not merely for the convenience of appel-
late judges.    Assignments in this court corresponding with
the specifications of error in the bill of exceptions should be so
framed as to enable this court to readily discern, without the
aid of argument, what particular errors are relied upon, and to

determine from the record itself whether appellant's position was the same below as it is in this court. It would be manifestly unfair for appellant to here urge an objection to this instruction to which the attention of the trial court was not directed on the hearing of the application for a new trial. In appellant's brief it is contended that the instruction was erroneous because it assumes the existence of certain disputed facts. This may or may not have been the contention in the circuit court. The assignment, and presumably the corresponding specification in the bill of exceptions, merely designates the paragraph of the charge to which exception is taken, without indicating in what respect such paragraph is erroneous. We decline to consider the assignment, without expressing any opinion as to the correctness of the instruction.

Finally, it is contended that the evidence was insufficient to justify the verdict. If the jury believed the plaintiff's own testimony—as they were warranted in doing, especially in view of Edmonds' cross examination—they were entirely justified in finding that the alleged release was fraudulently procured. That feature of the case demands no further attention. It was, we think, conclusively shown that the plaintiff was himself free from fault. The fuses under his charge were properly spitted, and he and his partner were on the cage in ample time to have avoided the accident had not the ascent of the cage been delayed by Hopkins' repeated efforts to spit his last fuse. Clearly, the jury could not have found that plaintiff was guilty of any negligence which contributed to his injuries. Nor do we think the jury were justified in finding that defendant was negligent in failing to provide proper means of ingress to the cage. Concerning this subject the plaintiff testified as follows:

"After the engineer had raised and lowered the cage before we spit the fuse, we noticed the height of the cage from the floor of the drift. After the signal was rung for blasting, and before we spit the fuse, we first noticed how high the cage was from the bottom of the drift. We could have provided a safe approach to the cage before we spit the fuse, if we had wanted to. The cage would have gone up at any signal, no matter what we would have given. After we gave the blast signal, the engineer raised the cage and lowered it to let us know he was ready, and after that, before we spit the fuse, we noticed the condition of the approach to the cage, and that is the reason we picked the timber up and set it up. We did notice how high the cage was before we spit the fuse, and we fixed it. We didn't keep on fixing it. There was no material there. Q. Why didn't you send to the top and get more material, or go to the top and get more material, and fix it until it was good enough to suit yon? A. That was good enough at the time." Hopkins, testifying on behalf of the plaintiff, says: "Joe Everly got on first. Then Hedlun got on, and called for me and Dunning to come, and of us Dunning got on first. While he was getting on, I stayed back there, and tried just once to spit the fuse, and I was ready to get on the cage as soon as he did. Dunning did not delay me any in getting on. I might have waited a second, and I was right upon him when he got on, and, if I remember, I think he slipped. If he delayed me at all, it was an imperceptibly short time. Everly did not delay Hedlun, and Hedlun did not delay Dunning. Everly and Hedlun were on the cage, and called for us, before either of us started for the cage. Dunning didn't delay me to speak of. * * * I think if I had not tried to light that fuse the last time, we

would have got out all right." The cage began to ascend the instant Hopkins got on it  No one would have been injured had it passed the roof of the crosscut before the first explosion. Had it reached this place of safety two seconds sooner than it did, there would have been no accident. What, then, was responsible for this fatal want of time? Certainly not the means of ingress to the cage. The cage could not ascend without Hopkins. If he was delayed at all by the other workmen in getting on, it was only for "an imperceptibly short time." Hence there is no escape from the conclusion that the accident resulted from the use of too much time by Hopkins in lighting his last fuse. Was he guilty of negligence on this account? The answer to this inquiry depends upon the kind of fuse he was using, his knowledge of its character; and involves a discussion of the second ground of negligence alleged in the complaint. As heretofore suggested, if, as a matter of fact, there is a substantial difference in the several kinds of standard fuses respecting the rapidity with which they burn, and such difference is not discernible by experienced miners in the exercise of ordinary care when working in a mine as were the plaintiff and his copartners on this occasion; and if defendant furnished a quicker fuse on the day of the accident than that formerly in use, knowing that it was quicker, without notifying its employes of the change, it clearly failed to perform a plain and imperative duty- One Daugherty, who was not the plaintiff's fellow servant, and who was authorized to act for the defendant in this regard; furnished a different make of fuse on the day of the accident from that previously in use. Whether it was quicker than the other; whether Daugherty knew it was quicker; whether the difference was discernible in the mine,

whether Hopkins or any of his companions knew of the change, or could have known of it by the exercise of ordinary care, are questions concerning which the evidence was conflicting, and therefore within the province of the jury to determine. The negligence of either Hopkins or Daugherty caused plaintiff's injuries, or they were the result of an unavoidable accident. Daugherty's negligence was the negligence of the corporation. Under instructions requested by defendant, the jury necessarily found that Hopkins was free from fault, and under the entire charge found that defendant's negligence was the proximate cause of the plaintiff's injuries. The verdict cannot be disturbed, based as it is upon evidence tending to prove every essential element of plaintiff's second alleged ground of negligence.

The judgment of the circuit court is affirmed.

CORSON, J., dissents.